**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

Counsel for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEREMY SCHOKMAN, Individually and on Behalf of all Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ROCKWELL MEDICAL, INC., ROBERT L. CHIOINI, and THOMAS E. KLEMA,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jeremy Schokman ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Rockwell Medical, Inc. ("Rockwell Medical" or the "Company"), analysts' reports and advisories about the Company, and information readily

obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Rockwell Medical securities between September 9, 2015 and February 29, 2016, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers and/or directors.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

5. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, as set forth in the accompanying Certification, purchased Rockwell Medical securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

7. Defendant Rockwell Medical operates as an integrated biopharmaceutical company in the United States and internationally, and offers products and services for the treatment of end-stage renal disease, chronic kidney disease, iron deficiency, secondary hyperparathyroidism, and hemodialysis. Rockwell Medical is incorporated in Michigan with principal executive offices located at 30142 Wixom Road Wixom, Michigan 48393. Rockwell Medical's securities trade on the NASDAQ under the ticker symbol "RMTI."

8. Defandant Robert L. Chioini ("Chioini") has been the President, Chief Executive Officer ("CEO"), and Director (Principal Executive Officer) of Rockwell Medical throughout the Class Period.

9. Defendant Thomas E. Klema ("Klema") has been the Vice President of Finance, Chief Financial Officer, Treasurer and Secretary (Principal Financial Officer and Principal Accounting Officer) throughout the Class Period.

10. Defendants Chioini and Klema are sometimes referred to herein as the "Individual Defendants."

11. Defendant Rockwell Medical and the Individual Defendants are referred to herein, collectively, as the "Defendants."

12. Defendant Rockwell Medical and the Individual Defendants are collectively referred to herein as the "Defendants."

13. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(f) approved or ratified these statements in violation of the federal securities laws.

14. As officers, directors, and controlling persons of a publicly-held company whose securities are and were registered with the SEC pursuant to the Exchange Act, and was traded on NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's business prospects and operations, and to correct any previously-issued statements that had become materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

15. Rockwell Medical is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

16. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Rockwell Medical under respondeat superior and agency principles.

**SUBSTANTIVE ALLEGATIONS**

**Background**

17. On January 26, 2015, Rockwell Medical issued a press release announcing that the U.S. Food & Drug Administration (the "FDA") has approved its drug Triferic® ("Triferic") for commercial sale, and touting Triferic's ability to become the market-leading therapy for hemodialysis patients combating chronic kidney disease.

**Materially False and Misleading Statements Issued During the Period**

18. On September 9, 2015, the Company issued a press release announcing the U.S. commercial launch of Triferic, stating in relevant part:

> WIXOM, Mich., Sept. 9, 2015 (GLOBE NEWSWIRE) -- Rockwell Medical, Inc. (NASDAQ:RMTI), a fully-integrated biopharmaceutical company targeting end-stage renal disease (ESRD) and chronic kidney disease (CKD) with innovative products and services for the treatment of iron replacement, secondary hyperparathyroidism and hemodialysis, announced today the nationwide commercial availability of Triferic (ferric pyrophosphate citrate). Triferic is the only FDA approved iron product indicated to replace iron and maintain hemoglobin in hemodialysis patients in the United States.
>
> Dr. Steven Fishbane, lead author and Chief, Division of Kidney Diseases and Hypertension, North Shore University Hospital and Long Island Jewish Medical Center, stated, "I'm very excited to be able to provide Triferic to my patients. Having iron delivered at every dialysis treatment that immediately binds to transferrin and that does not induce iron overload is very similar to the slower, natural process in which iron is used in the body to maintain hemoglobin. We have seen the positive benefits Triferic has had on our patients during the clinical studies and now we are excited to have the drug available to treat patients beyond the research setting. Treating patients with a repletion therapy like IV iron has been associated with a variety of risks. Triferic, in contrast, is a true iron maintenance therapy with an exceptional safety profile and is an important new option for treating patients on chronic hemodialysis."

"We are thrilled to bring Triferic to the U.S. dialysis market," stated Robert L. Chioini, Founder, Chairman and Chief Executive Officer of Rockwell Medical. "Triferic addresses a major unmet need as it overcomes functional iron deficiency in hemodialysis patients. IV iron is generally given weekly and by design is trapped in the patient's liver, which leads to iron overload and the functional iron deficiency that is prevalent in patients today. Triferic however replaces iron at every patient treatment and maintains hemoglobin concentration without increasing iron stores, because the iron is used immediately and not stored in the liver. Triferic benefits patients, nurses, doctors and healthcare providers and we are very motivated to commercialize it. We believe Triferic will become the standard of care in iron replacement for dialysis patients."

19. On November 9, 2015, Rockwell Medical issued a press release announcing its third quarter fiscal year 2015 results and touting the commercial launch of Triferic, stating in relevant part:

**2015 YTD Corporate Highlights**

- Commenced U.S. commercial launch of Triferic® September 2015.
- Commenced marketing and advertising activity, including introduction of Triferic website (www.triferic.com) for commercial drug launch.
- Increased product inventory to support commercial launch.
- Successful PRIME ESA Sparing Clinical Study published in Kidney International.
- Successful CRUISE 1-2 Phase 3 Clinical Studies published in Nephrology Dialysis Transplantation.
- Triferic clinical data accepted and presented at multiple U.S. and international conferences.
- National Kidney Foundation Spring Meeting
- Annual Dialysis Conference
- ERA-EDTA Congress in Europe
- ASN Kidney Week Annual Meeting
- Received U.S. CMS Q-Code assignment for reimbursement of Triferic; effective July 1, 2015.
- Obtained U.S. FDA drug approval to market Triferic (ferric pyrophosphate citrate), the only iron replacement and hemoglobin maintenance product for hemodialysis patients.

20. With respect to these results, Defendant Chioini stated:

"We had a very positive and productive third quarter," stated Robert L. Chioini, Chairman and CEO of Rockwell. "We experienced solid concentrate sales and results, and most importantly **we commenced U.S. commercial launch of Triferic, our innovative iron replacement and hemoglobin maintenance drug**

> **to treat anemia in hemodialysis patients. The clinical community has responded favorably to Triferic** and its unique mechanism of action, which enables iron to bind immediately to transferrin and bypass the current iron sequestration and RE block that occurs with IV iron products. The drug's ability to deliver iron at every patient treatment and maintain hemoglobin concentration without increasing iron stores has received strong interest across the spectrum of dialysis providers, from large-to-small. We anticipate broad clinical adoption over the next several months of this first-in-class iron maintenance therapy for ESRD patients."
>
> [Emphasis added].

21. On November 9, 2015, Rockwell Medical held an investor conference call to discuss Rockwell Medical's third quarter fiscal year 2015 results. During the investor conference call, Defendant Chioini stated in part:

> **We made significant progress on a number of fronts during the third quarter. Most importantly, the U.S. commercial launch of Triferic**, and we're excited to provide this update.
>
> * * *
>
> Just over the first eight weeks, Triferic has received positive feedback from the dialysis community including providers, doctors, nurses, and patient advocacy groups. And although expected it is very encouraging. **Importantly, I'm pleased to announce that we have just signed a supply contract with one of the four largest dialysis providers. We have taken orders from other customers as well. We continue to be very busy promoting Triferic to our customer base.** As you are aware, we know this market very well, having successfully launched a number of renal products over the past 20 years. We have stable long-term relationships with all the providers cultivated by providing them with innovative, high quality products and exceptional customer delivery service consistently overtime. And we are leveraging these relationships as we roll out Triferic.
>
> As you know this is a very concentrated customer market, and after two recently announced acquisitions there are now just seven customers who control about 85% of the market, all of whom we have relationships with. Due to the concentrated nature of our customer base, **we expect Triferic to capture a significant portion of the market.** Triferic as we announced previously was granted a unique product reimbursement code by CMS. Last week CMS came out with its final rules detailing how the agency will pay for services provided to Medicare beneficiaries for 2016. **As expected, Triferic is in the bundled reimbursement, therefore as already accounted for in the bundled payment made to healthcare providers. So when the customers convert to Triferic,**

**they will be paid for Triferic from the portion of their payment that was originally allocated to IV iron.**

We've talked a lot about Triferic and how it's a true iron maintenance therapy, its exceptional safety profile, it's unique mode of action, its ability to donate its iron directly to transparent and bypass the RE block resulting in efficient iron delivery and stable hemoglobin concentrations without increasing iron stores. The fact is, Triferic is the most important new treatment option for hemodialysis patients in the last 25 years. Triferic benefits all stakeholders within the healthcare system; patients, nurses, doctors, and healthcare providers. And we expect Triferic to become the standard of care in treating anemia and dialysis patients in the U.S., and then over the next several years globally.
[Emphasis added].

22. During the investor conference call, Defendant Chioini had the following exchanges with securities analysts:

**Charles Haff**

And then I had a question on Triferic, is there a shelf life for the product?

**Rob Chioini**

Yes it's three years, 36 months.

**Charles Haff**

And then you mentioned OUS maybe over the next few years I'm wondering it's been a little while since we heard anything about potential distribution partners. I know that you're having some conversations, is there any movement there or is all the focus on the U.S. right now and you've kind of put that on the back burner for now?

**Rob Chioini**

**No that is not definitely on the back burner. There's actually a lot of activity. I think we're very close to a couple different potential deals and our goal is to make sure that we get every bit of value that we can get before we sign anything with the distributor and that of course is after we've made sure that there is a best partner in that territory. So still very active.**

* * *

**Unidentified Analyst**

> And then just one last question so **congratulations on getting Triferic in the bundle payment. So** it looks like they took away a portion that was allocated to IV Iron, can we get more specifics on that so it's iron sucrose that it's taking away from and is it comparable the amount that was allocated for IV Iron that is for Triferic?
>
> **Rob Chioini**
>
> Right. I think the best way to maybe understand this is to go back to 2011 when the bundle was being put together, what CMS did is they took a $1 amount and allocated it to each drug that was being used and then added it to bundle. Today it's all really just kind of one big payment so those allocations really don't play out anymore, but underneath that one big payment. **The amount that's being spent on IV Iron at least that much is now going to go in so many converts to Triferic are going to stop or discontinue use of the IV product and they're going to move to Triferic, they're going to get whatever they were getting or whatever they have allocated mostly probably internally now as they manage their costs that allocation will go to Triferic.**
>
> [Emphasis added].

23. The statements referenced in ¶¶ 18 – 22 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the primary product offering for Triferic will be in a powder packet packaging, which the FDA has not yet approved; (2) Rockwell Medical is seeking to obtain transitional add-on payment reimbursement for Triferic with the Centers for Medicare & Medicaid Services instead of bundled reimbursement; and (3) as a result, Defendants' statements about Rockwell Medical's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Emerges

24. On February 29, 2016, Rockwell Medical issued a press release after the market closed announcing disappointing fourth quarter and fiscal year 2015 results.

25. With respect to these results, Defendant Chioini stated:

> "We had an exceptional year in 2015," stated Mr. Robert L. Chioini, Chairman and CEO of Rockwell. "We obtained FDA approval for Triferic, scaled-up manufacturing and launched our novel iron replacement drug in September. We have been educating customers large and small about Triferic's clinical and cost-saving benefits and its convenient in-center use. **We have also strengthened the foundation for the drug's commercial success by developing new packaging, which provides economic benefit to our customers and Rockwell, and it should be commercially available in about 8 weeks. Importantly, we are working with CMS to obtain transitional add-on payment for Triferic which, if obtained, should have a positive impact on market adoption**. We expect Triferic sales to grow considerably in 2016. Additionally, in advancing our global licensing strategy, we recently secured what we believe to be the best positioned pharmaceutical partner in China to commercialize Triferic for both hemodialysis and future therapeutic indications, along with Calcitriol, in what will become the single largest dialysis market in the world." Mr. Chioini also stated, "We expect to have Calcitriol commercially available to customers in the U.S. near the end of April and we expect our product sales to start generating profits in 2016."
>
> [Emphasis added].

26. On February 29, 2016, Rockwell Medical held an investor conference call after the market closed to discuss Rockwell Medical's disappointing fourth quarter and fiscal year 2015 results. During the investor conference call, Defendants Klema and Chioini stated in part:

> **Thomas Klema:**
>
> **Our net sales of Triferic were immaterial for 2015**.
>
> * * *
>
> **Robert Chioini**
>
> **While the normal sales process is occurring, we have been working on two key initiatives and both are important to commercial rollout. These are packaging and reimbursement. Regarding packaging, prior to submitting our NDA to the FDA, for Triferic drug approval, we created a more efficient and more cost-effective way to package Triferic.**
>
> **Instead of having the active pharmaceutical ingredient or API manufactured as a powder and packaged into a liquid solution in an ampoule, which is what was FDA approved, we determined we could take the manufactured API powder straight to finished packaging, with an additional process step in**

**between**. So we are able to package Triferic as a powder in a packet, similar to a packet of sugar.

This improvement enables the customer to reduce the storage space and number of orders needed to utilize the drug, and it greatly reduces Rockwell's cost of goods compared to the liquid ampoule. **This required a separate NDA and we filed that submission with the FDA last year, and we expect to have approval by the end of April. The powder packet will be commercially available immediately thereafter, and it will be the primary product offering.**

The other key initiative, which is extremely important for the commercial process, is reimbursement. As you are aware, the Centers for Medicare and Medicaid Services or CMS, granted a unique product reimbursement J-Code for Triferic, which became effective on January 1 this year.

**In November of last year, CMS informed us that Triferic was going to be part of the ESRD reimbursement payment, the bundled payment. We felt, however, that Triferic met the criteria to be granted a transitional add-on payment, which would place Triferic reimbursement outside of the bundle for a period of time**. So we began discussions with CMS and those discussions with Medicare policymakers are ongoing.

[Emphasis added].

27. During the investor conference call, Defendants Chioini had the following exchange with a securities analyst:

**Annabel Samimy**

I just want to understand something. **If I heard you correctly, you're not really going to be launching Triferic, until you get approval of this powder, this new packaging, and it doesn't seem like you have any kind of agreement on reimbursement from CMS, so for this x bundle type of reimbursement, so are you also not going to be able to price Triferic, until you have agreement with CMS, because this is already a year plus after launch, and I guess, I'm little bit surprised that you can't seem to launch this product at all?**

**Robert Chioini**

So I'd spread off and I'd say, we launched the product in September. And **at that time, the clarity that we had on the reimbursement was the bundle. And then in November after CMS -- CMS was in a quiet period up till November, it became clear that we have an opportunity to secure a different type of reimbursement, which I explained on the call, was transitional**. So the drug was launched.

> As far as the packaging goes, the ampules are what are being used currently. The ampules will continue to be used until the powder packet is available. I'm limited on what I can share in terms of pricing, as we're in the midst of being in discussions with CMS on this transitional payment.
>
> I mentioned on the call that there's no formal process, there is nothing where you submit. You have to wait x number of days. It's a fluid process and we're working on it as we speak. So we continue to do the work with customers both large and small. And at the same time, we continue to do the work on reimbursement. It's obviously important to have that reimbursement squared away sooner than later.
>
> [Emphasis added].

28. On this news, shares of Rockwell Medical fell $3.29 per share or approximately 34% from its previous closing price to close at $6.31 per share on March 1, 2016, damaging investors.

29. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

30. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Rockwell Medical securities trade on the NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

31. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Rockwell Medical securities were actively traded on

the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Rockwell Medical or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

32. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

33. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

34. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Rockwell Medical;
- whether the Individual Defendants caused Rockwell Medical to issue false and misleading public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading public statements;
- whether the prices of Rockwell Medical securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

35. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

36. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Rockwell Medical securities are traded in efficient markets;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Rockwell Medical securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

37. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

38. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

39. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

40. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

41. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to

defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Rockwell Medical securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Rockwell Medical securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

42. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Rockwell Medical securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Rockwell Medical's finances and business prospects.

43. By virtue of their positions at Rockwell Medical, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In

addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

44. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Rockwell Medical, the Individual Defendants had knowledge of the details of Rockwell Medical's internal affairs.

45. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Rockwell Medical. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Rockwell Medical's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price for Rockwell Medical's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Rockwell Medical's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Rockwell Medical securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged upon the revelation of the alleged corrective disclosures.

46. During the Class Period, Rockwell Medical's securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be

disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Rockwell Medical securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Rockwell Medical securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Rockwell Medical's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

47. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

48. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violation of Section 20(a) of The Exchange Act Against The Individual Defendants

49. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

50. During the Class Period, the Individual Defendants participated in the operation and management of Rockwell Medical, and conducted and participated, directly and indirectly,

in the conduct of Rockwell Medical's business affairs. Because of their senior positions, they knew the adverse non-public information regarding Rockwell Medical's business practices.

51. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Rockwell Medical's financial condition and results of operations, and to correct promptly any public statements issued by Rockwell Medical which had become materially false or misleading.

52. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Rockwell Medical disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Rockwell Medical to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Rockwell Medical within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Rockwell Medical securities.

53. Each of the Individual Defendants, therefore, acted as a controlling person of Rockwell Medical. By reason of their senior management positions and/or being directors of Rockwell Medical, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Rockwell Medical to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Rockwell Medical and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

54. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Rockwell Medical.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: March 4, 2016

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Phillip Kim
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, NY 10016
Phone: (212) 686-1060
Fax: (212) 202-3827

*Counsel for Plaintiff*